CASE NUMBER 22-12493

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**GEORGE ANGEL HARRIS,**

Plaintiff/Appellant,

v.

**JON HIXON and JOSEPH BULTMAN,**

Defendants/Appellees.

---

ON DIRECT APPEAL FROM A FINAL ORDER
OF THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA

---

**BRIEF OF APPELLANT**

---

CRAIG T. JONES
Georgia Bar No. 399476
Craig T. Jones, P.C.
Post Office Box 129
Washington, Georgia 30673
(706) 678-2364 (office)
(678) 643-0062 (cell)
craigthomasjones@outlook.com

*Attorney for Appellant George Harris*

1

No. 22-12493-CC
*Harris v. Hixon*
C-1 of 2

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a)(2), the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

Association County Commissioners Georgia (ACCG-IRMA)

Bultman, Joseph

Columbia County and its Sheriff and Board of Commissioners

Ellington, James

Epps, Hon. Brian K.

Frails, Randy and the law firm of Frails & Wilson

Hall, Hon. J. Randall

Harris, George Angel

Haynes, Tameka

Hixon, Jonathan

No. 22-12493-CC
*Harris v. Hixon*
C-2 of 2

Hull Barrett, P.C.

Jones, Craig T. and Craig T. Jones, P.C.

Richmond County and its Sheriff and Board of Commissioners

Respectfully submitted this 24th day of August, 2022.

*/s/ Craig T. Jones*
CRAIG T. JONES
Georgia Bar No. 399476
Counsel for Appellant

CRAIG T. JONES, P.C.
Post Office Box 129
Washington, Georgia 30673
(678) 643-0062
craigthomasjones@outlook.com

# **TABLE OF CONTENTS**

Certificate of Interested Parties and Corporate Disclosure Statement………............2

Table of Contents……………………………………………………….…..………4

Table of Authorities…………………………………….......................................5

Statement Regarding Oral Argument……………………………………………8

Statement of Jurisdiction……………………………………………………...…8

Statement of the Issues ……………………………………………………….....8

Statement of the Case………………………………………………………….9

      Nature of Case……………………………………………………….9
      Course of Proceedings and Dispositions in the Court Below………………..9
      Statement of the Facts……………………………………………………10
      Standard of Review.................................. …………………………20

Summary of Argument ....... ……………………………………………20

Argument and Citations of Authority ...... ……………………………………...21

   A. Investigator Hixon Violated Clearly Established Fourth Amendment
      Law by Obtaining an Arrest Warrant Based on False Conclusory
      Statements Without Any Evidence to Support Probable Cause……………21

   B. Investigators Bultman and Hixon Violated Clearly Established Fourth
      Amendment Law by Failing to Conduct a Reasonable Investigation Before
      Causing an Arrest to be Made Without Probable Cause…………………..25

   C. Because Both Defendants Violated Clearly Established Law, They
      Are Not Entitled to Qualified Immunity…………………………………...30

   D. Plaintiff's Law Enforcement Expert Should be Permitted to Testify
      that the Investigation Was Unreasonable…………………………………..33

Conclusion…………………………………………………………...48

Certificate of Compliance……………………………………………...49

Certificate of Service…………………………………………………...50

## TABLE OF AUTHORITIES

<u>CASES</u>

*Adams v. Carlisle*, 278 Ga. App. 777, 630 S.E. 2d 539, *cert. denied* (2006)……..28

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014)……………………36

*Allison v. McGhan Med. Corp.*, 184 F. 3d 1300 (11th Cir. 1999)………………...35

*Anderson v. Creighton*, 483 U.S. 635 (1987)……………………………………..30

*Butler v. First Acceptance Ins. Co., Inc.*,
     652 F. Supp. 2d 1264 (N.D. Ga. 2009)……………………………...35

*Byars v. United States*, 273 U.S. 28 (1927)…………………………………20-21

*Carey v. Piphus,* 435 U.S. 247 (1978)…………………………………………….29

*Corporate Property Investors v. Milon*,
     249 Ga. App. 699, 549 S.E.2d 157, *cert. denied* (2001)…………….29

*Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018)……………25-28, 33

*Daniels v. Bango*, 487 F. App'x 532 (11th Cir. 2012)………………………..24, 33

*Daubert v. Merrell Dow Pharm., Inc.*,
     509 U.S. 579 (1993)…………………………10, 16, 34-36, 38-39, 48

*Davis v. Williams*, 451 F.3d 759 (11th Cir.  2006)…………………….………….31

*Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*,
     795 F.3d 1324 (11th Cir. 2015)……………………………………….40

*Franks v. Delaware*, 438 U.S. 154 (1978)…………………………9, 19, 21-24, 32

*Gonzales v. City of San Jose*,
     No. 4:13-CV-00695-PJH (N.D. Cal. 12/4/2015)……………………40

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)…………………………………………30

*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995)……………………………20

*Holmes v. County of Orange*,
    No. 8:16-cv-00867-JLS-JCG (C.D. Cal. 10/13/2017)………………40

*Hooks v. Brewer*, No. 3:16-cv-00023-DHB-BKE (S.D. Ga. 1/29/2018),
    *aff'd in part and rev'd in part on other grounds*, No. 18-10628
    (11th Cir. 6/19/2020), *cert. denied* (U.S. 2/22/2021)………………29

*Hope v. Pelzer*, 536 U.S. 730 (2002)……………………………………………..30

*Hudson v. Michigan,* 547 U.S. 586 (2006)………………………………………….22

*Johnson v. City of Los Angeles*,
    No. 2:17-CV-04104-KS (C.D. Cal. 1/31/2019)……………………40

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)…………………25, 31

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999)…………………...35-36

*Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006)………………………...34

*Lee v. Ferraro*, 284 F. 3d 1188 (11th Cir. 2002)…………………………………31

*Madiwale v. Savaiko*, 117 F. 3d 1321 (11th Cir. 1997)…………………………...24

*Malley v. Briggs*, 475 U.S. 335 (1986)…………………………………22, 29, 32

*McDowell v. Brown*, 392 F. 3d 1283 (11th Cir. 2004)……………………………35

*Mincey v. Arizona*, 437 U.S. 385 (1978)…………………………………………22

*Monroe v. Pape,* 365 U.S. 167 (1961)……………………………………………29

*Patel v. County of Riverside*, No. 5:17-CV-1925-MWF (SPX) (11/25/2019)……41

*Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010) …………………..30

*Rankin v. Evans*, 133 F. 3d 1425 (1998)…………………………………..8, 26, 33

*Sheth v.  Webster*, 145 F.3d 1231 (11th Cir. 1998)………………………………31

*Skop v. City of Atlanta*, 485 F.3d 1130 (11th Cir. 2007)……………………31, 33

*Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998)……………………31

*Tobias v. City of Los Angeles*,
        No. 2:17-cv-01076-DSF-AS (C.D. Cal. 12/7/2018)……..………….41

*United States v. Kirk*, 781 F. 2d 1498 (11th Cir. 1986)……………………….24, 43

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)………………………………31

*Von Stein v. Bresher*, 904 F.2d 572 (11th Cir. 1990)……………………………..31

*Whiteley v. Warden,*
        *Wyoming State Penitentiary*, 401 U.S. 560 (1971)………19, 21-22, 32

*Young v. New Process Steel, LP*, 419 F.3d 1201 (11th Cir. 2005)………………..40

STATUTES, RULES, AND CONSTITUTIONAL PROVISIONS

The Fourth Amendment…………………………………………...……*passim*

28 U.S.C. §1291 ……………………………………………….……..8

28 U.S.C. §1331 ……………………………………………………...8

28 U.S.C. §1367 ……………………………………………………...8

42 U.S.C. §1983 ……………………………………………...…….9, 22, 29

Fed. R. Evid. 702…………………………………………………...34, 36

Fed. R. Evid. 704…………………………………………………...38, 43

O.C.G.A. §16-9-38(a)…………………………………………………..26

O.C.G.A. §17-3-1(c)…………………………………………………11

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument.  Argument will aid the decisional process because this case is fact-intensive, and the opportunity to directly engage counsel about the fine points of the record will benefit the Court in its application of clearly established Fourth Amendment principles which were misinterpreted by the trial court and deserving of a full de novo review.

## STATEMENT OF JURISDICTION

**A.    Basis for District Court's Subject Matter Jurisdiction.**

The District Court had subject matter jurisdiction over the instant case pursuant to 28 U.S.C. §§1331 and 1367.

**B.    Basis for Appellate Court's Subject Matter Jurisdiction.**

This is a direct appeal from a final judgment of the District Court, for which this Court has subject matter jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

A. Whether Investigator Bultman violated the Fourth Amendment by failing to conduct a reasonable investigation as required by *Rankin v. Evans*, 133 F. 3d 1425 (1998) and other clearly established Eleventh Circuit law, for which they are not entitled to qualified immunity.

B. Whether Investigator Hixon violated the Fourth Amendment by obtaining an arrest warrant based on false conclusory statements without presenting any

supporting facts to establish probable cause as required by *Franks v. Delaware*, 438 U.S. 154 (1978) and other clearly established Supreme Court precedent, for which they are not entitled to qualified immunity.

C. Whether the trial court committed reversible error by excluding testimony from an admittedly qualified law enforcement expert that the Defendants failed to conduct a reasonable investigation when that testimony would clearly assist the jury in understanding proper investigative procedures.

## STATEMENT OF THE CASE

### Nature of Case

This is a 42 U.S.C. §1983 case under the Fourth Amendment alleging that Plaintiff was wrongfully arrested based on a faulty photo identification made by one police officer to another, when neither officer conducted any additional investigation to verify the accuracy of the identification and readily ascertainable facts that would have indicated that the crime was committed by someone else.

### Course of Proceedings and Disposition in the Court Below

Plaintiff Harris filed his Complaint against Defendants Hixon and Bultman on October 9, 2020 alleging violations of the Fourth Amendment, with pendent state law claims for false imprisonment, malicious prosecution, and violation of the Georgia Constitution. (R. 1). On December 11, 2020, both Defendants filed timely Answers to the Complaint. (R. 6, 7).

9

After the close of discovery, both Defendants filed motions for summary judgment on September 7, 2021, to which Plaintiff filed a timely consolidated response on October 6, 2021.  (R. 17, 22, 38).  Defendant Bultman also filed a *Daubert* motion to exclude the testimony of Plaintiff's law enforcement expert on December 11, 2021.  (R. 21).  Plaintiff filed a timely response to that motion on October 1, 2021.  (R. 34).

On July 19, 2022, the court entered an Order granting Defendants' motions for summary judgment on all claims as well as the motion to exclude expert testimony, along with a clerk's judgment terminating the case.  (R. 50, 51).  Plaintiff filed a notice of appeal from that final order on July 21, 2022.  (R. 53).

## Statement of the Facts

George Harris was arrested for a warrant he knew nothing about when he was a passenger in an automobile accident and produced his ID to the responding police officer, who ran it through his computer and found there was an outstanding felony warrant against Mr. Harris.  (R. 25-1 at 22]).   The warrant was for financial institution fraud, charging him with making less than $10 worth of unauthorized debit card transactions with a stolen card – which is a felony under O.C.G.A. §16-9-33 irrespective of how much money is involved.[1]  (R. 38-7).  He was in fact not

[1]Specifically, Harris was charged with renting two videos from Redbox® vending machines at stores in Augusta with the stolen card:  one for $3.78 and one for

guilty of the charge, which was ultimately dismissed by the Richmond County District Attorney.  (R. 38-8; R. 25-1 at 21-22).

The only reason he was charged in the first place was because a Columbia County Sheriff's Office investigator – while investigating the theft of the debit card from a parked car in that jurisdiction – mistakenly identified a suspect captured on security video while using the card as Harris. (R. 19, R. 22-1). That misidentification was based upon an investigator's recollection of what Harris looked like on two occasions where the investigator, Defendant Bultman, had briefly encountered Harris over the past four years.  (R. 19, ¶¶8-10).

The two photographs below clearly demonstrate how unreliable the identification was, and how unreasonable it is to compare a current photograph of a crime in progress with an investigator's memory of what a possible suspect looked like years earlier, during which time the suspect would have aged and – as clearly shown by photographs which were readily available on social media – his hair had grown two feet longer.  The first photo below is a still image of the actual criminal taken by security video:

---

$3.24, for a total ill-gotten gain of $7.02. Both transactions were committed the same day approximately 6 weeks before the warrant was issued.  (R. 38-7). Because the statute of limitations for felonies is 4 years in Georgia, there was plenty of time to do an investigation.  O.C.G.A. §17-3-1(c).



[5337 - Augusta, GA-Front Walk 1][1/10/2019 7:28:09 AM][420x236][006.0K][06.0FPS][Motion][H264]

The next photo, which was posted on Mr. Harris' Facebook page, is a picture of Harris and his mother together at an outdoor concert:

12



Aside from the obvious differences in hair length, facial structure, and skin tone, they are also different heights as shown by the following photograph of Mr. Harris taken at the same Redbox machine:



Mr. Harris is clearly not the same man shown on the video, which would

have been apparent if either the Columbia County investigator who made the misidentification (Defendant Bultman) or the Richmond County investigator who took Bultman's word at face value (Defendant Hixon) when he swore out a warrant saying that Harris had in fact committed the crime without any investigation whatsoever to corroborate or rule out Bultman's unreliable suspicion.

According to Plaintiff's expert, a long-time major crimes investigator for the Los Angeles Police Department,

> …[Y]ou're looking at comparing photographs without doing an investigation. You've got to do an investigation, because your comparison could be wrong and you've got to go out there -- you think this is who this person is and then you go out there and you do your investigation and talk to him to see if, in fact, that was done. You want to see if he was even in -- even in the area during that time. You want to know if he was even in the county or the state during that time. And these are called alibis. And these things have to be investigated, corroborated, and everything else. You can't -- you just can't stop and say, oh, this looks like somebody. Well, that's not an identification. Looking like somebody is not – you know, any one of us can look like somebody and the next thing you know, any one of us could be arrested for something that we did not do. You've got to do an investigation.

(R. 37-1 at 39-40).  Plaintiff's expert goes on to say that "there's a multitude of things that can be done to corroborate alibis, but you just can't sit there and say it looks like somebody and proceed with it and close your investigation, because that's not an investigation."  (*Id.* at 41).[2]

---

[2] The trial court rejected this testimony, essentially ruling that expert opinion on

Unfortunately, Bultman failed to conduct a proper investigation to confirm or rule out Harris as the suspect in the video. (R. 38- 9). He did not locate Harris to compare his present appearance with the appearance of the perpetrator, to interview him or members of his family, or to otherwise confirm or rule out any connection between Harris, the theft, or the use of the card. (*Id*.). While it may be argued that the minor nature of the crime ($7.02 in authorized debit card transaction) did not justify the expenditure of substantial time and effort on a reasonable investigation, that is all the more reason not to deprive a citizen of his liberty because of it.

Reasonable jurors can infer that Bultman simply jumped to a conclusion based upon his recollection and compared the video image to a 2017 mugshot of Harris on file with his department, which did not reflect that his hair was now much longer and he looked nothing like he had in the old pictures. (Compare 2019 and 2017 mugshots of Harris at R. 38-2 and 38-3). Moreover, there were discernible differences between Harris and the subject depicted in video as to their height, build, facial features, skin tone, and tattoo markings which Bultman should

---

the reasonableness of Defendants' investigation (or lack thereof) would not assist the jury in determining the reasonableness of the arrest – only to go on and express its own opinion that the mistaken identity was a reasonable mistake as a matter of law in the absence of evidence to the contrary. While that ruling was on a *Daubert* motion, it was part of the same order granting summary judgment from which this appeal is taken, and accordingly it is also a subject of this appeal.

have observed from comparison of the images and would have been obvious had he contacted or observed Harris in person. (R. 38-1, 38-2, 38-3, 38-5, 38-5, 38-6; R. 35 at 43, 82-86).

Instead of conducting a proper investigation, however, he merely referred the matter to an investigator at the Richmond County Sheriff's Office, Defendant Hixon, because the use of the stolen debit card and the video recording of that crime had occurred in Richmond County. Bultman told Hixon that he had already identified Harris as the suspect, and Hixon made no further attempt to investigate the matter on his end other than asking a couple of white co-workers to also look at the photos – which authorizes an inference that there may have been a question in his mind about the identification. (R. 30-1 at 16-18). However, Harris was not white and the officers were, and cross-ethnic identifications are known to be less reliable than identifications made by persons of the same race. (R. 35 at 48-52). Hixon acknowledges this in his deposition but made no attempt to ask a person with black or brown skin for their opinion because there were none in the financial crimes section that he was assigned to. (R. 30-1 at 16-19).[3]

---

[3] The Court can take judicial notice of U.S. Census figures indicating that the population of Augusta, Georgia was 202,081 in April 2020, of which 57.5% were self-identified as black or African-American, 3.3% of which were listed as multi-racial, and 5.1% were Hispanic or Latino persons not identifying as white. U.S. Census Bureau QuickFacts: Augusta-Richmond County consolidated government (balance), Georgia. In other words, approximately 65% of the population has

Even ignoring the question of race altogether, if the video had been taken at the Capitol on January 6, 2021, a police officer's belief that a suspect in the video looked like someone he knew would not be enough to convince a federal magistrate to issue a misdemeanor trespassing warrant – let alone a felony warrant like the one issued here, which was not only based on a faulty identification but also a failure to provide the magistrate with the facts upon which the conclusory affidavit was based. When asked whether it was reasonable for the Richmond County investigator (Defendant Hixon) to take Bultman's identification at face value, Plaintiff's expert testified as follows:

> Absolutely not. You've got to do an independent investigation. Because in the end you've got to stand by your work. You can't stand by other people's work. You've got to do your work.

(R. 37-1 at 85).  With or without expert testimony, reasonable jurors can reach the same conclusion, since it was Hixon who would take an oath before a magistrate that the facts he was presenting were true – which he could not swear to without

_____

racial characteristics similar to those of Mr. Harris (whose father is black and mother is Hispanic), while only 33.0% of Augusta's population – just 1 in 3 people – are the same race as the Defendant investigators in this case. *Id.*  The challenge of cross-ethnic identification is well known in professional law enforcement circles, and the fact that such identifications pose a higher rate of error is all the more reason to conduct an investigation to corroborate the resemblance. (R. 35 at 48-52; R. 38-9 at 4).  Because there are thousands of males in Augusta of similar age and race, there are likely hundreds which bear a vague resemblance to one another if the only investigation done is to compare a grainy video image to a two-year-old mugshot.

having conducted his own investigation into those facts.

The fact that Hixon showed the photos to other investigators in his section before applying for the warrant authorizes an inference that he was unsure about Bultman's identification.  But whether he had any doubts or not, Hixon ultimately took Bultman's word for the identification without making any reasonable effort to corroborate it, simply because Bultman said "he was confident that Plaintiff was the suspect in the videos."  (R. 22-1 at ¶15).  Based solely on that representation by Bultman, Hixon swore out an arrest warrant which falsely stated to the magistrate that Harris had committed the crime, and nothing more.  (R. 7, p. 2).

The warrant application was defective on its face because it contained no supporting facts – never mentioning that the suspect was identified based on photo comparisons, let alone providing copies of photographs or other documentation so the magistrate could make an independent assessment of probable cause – and merely made the conclusory statement that Harris had committed the crime, which flies in the face of longstanding Supreme Court precedent.  *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (application for arrest warrant must present enough facts to allow "the magistrate to make an independent evaluation of the matter"); *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565 (1971) (conclusory affidavit violates Fourth Amendment because enough facts must be presented to the magistrate to "support the independent judgment of a disinterested

magistrate"); *Byars v. United States*, 273 U.S. 28, 29 (1927) (mere statement of officer's belief not enough to support warrant).

**Standard of Review**

This Court reviews the decision to grant summary judgment de novo, applying the same legal standards which bound the district court. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

## SUMMARY OF ARGUMENT

George Harris was arrested in 2019 on felony charges of debit card fraud for $7.02 worth of unauthorized transactions on a stolen card which he in fact did not commit – based on a misidentification of the suspect which would have been glaringly obvious had investigators conducted a reasonable investigation into readily discoverable facts. It was a Fourth Amendment violation for Investigators Bultman and Hixon to fail to conduct an investigation to corroborate or rule out the faulty identification before causing Harris to be arrested, and it was also a Fourth Amendment violation for Investigator Hixon to apply for an arrest warrant based on a conclusory oath that Harris was in fact the offender without any supporting facts to establish probable cause or allow the magistrate to make an independent determination of same. Because both investigators violated clearly established law, they are not entitled to qualified immunity and the trial court erred by granting them summary judgment on that basis. In the same order, the trial court also erred

by excluding the testimony of Plaintiff's expert, even though his opinions of the insufficiency of the investigation would assist the jury in assessing the reasonableness of the arrest under the Fourth Amendment.

**ARGUMENT AND CITATION OF AUTHORITY**

**A. Investigator Hixon Violated Clearly Established Fourth Amendment Law by Obtaining an Arrest Warrant Based on False Conclusory Statements Without Any Evidence to Support Probable Cause**

The very text of the Fourth Amendment provides that "… no Warrants shall issue, but upon probable cause, supported by Oath or affirmation…" U.S. CONST. amend. IV.   The Fourth Amendment requirement that a warrant be "supported by Oath or affirmation" means that an officer applying for a warrant must do more than aver that he "has good reason to believe and does believe" that a warrant should issue. *Byars v. United States,* 273 U.S. 28, 29 (1927). A conclusory warrant affidavit with words to that effect and nothing more "clearly is bad," *id.*, because enough facts must be presented to the magistrate to "support the independent judgment of a disinterested magistrate, *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 565 (1971), and allow "the magistrate to make an independent evaluation of the matter." *Franks v. Delaware,* 438 U.S. 154, 165 (1978).

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its

> protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Mincey v. Arizona*, 437 U.S. 385, 395 (1978).  The only way that a "neutral and detached magistrate" can make such a determination is by conducting their own independent evaluation of specific facts presented by the officer, without embellishment or false inuendo.  It is a Fourth Amendment violation for an officer to offer false or misleading facts to a magistrate in support of a warrant application, and a warrant supported by such "facts" lacks probable cause.  *Franks v. Delaware*, 438 U.S. 154 (1978); *Malley v. Briggs*, 475 U.S. 335 (1986).

An officer who secures a warrant without presenting the "particular facts and circumstances underlying the existence of probable cause" is subject to suit for damages under 42 U.S.C. §1983. *Franks v. Delaware,* 438 U.S. at 165; *see also Hudson v. Michigan,* 547 U.S. 586, 597 (2006); *Malley,* 475 U.S. at 344.  The validity of such a warrant turns on the following question:  Does the warrant affidavit meet the standards of *Whiteley* and *Franks*, *supra,* and contain enough facts to permit the independent judgment of a disinterested magistrate?

In short, probable cause can only be determined from the four corners of the warrant affidavit, and bald conclusory statements are not enough.  Facts must be sworn to.  In the case at bar, the warrant affidavit produced no supporting facts that were capable of independent review:  merely an opinion that the bad guy in the

video looked like somebody the officer had run into before, which was improperly

phrased as a conclusory statement that Harris was in fact the perpetrator. *And it is*

*clear from Investigator Hixon's testimony that he presented no information to the*

*magistrate other than the affidavit itself.* (R. 30-1 at 52)(emphasis added).

Rather than stating the "particular facts and circumstances" required by

*Franks* and *Whitely* for the magistrate to make her own determination of probable

cause, the 'Probable Cause' portion of Hixon's affidavit merely states as follows:

> On January 9, 2019, between 2200 and 2300 hours, Jacob Newman
> reported that his vehicle had been broken into at 3830 Washington
> Road, Suite 15, Martinez, GA. Newman further stated that his
> financial transaction card was stolen during this incident (card number
> 4482 3226 9534 6319 from SRP Federal Credit Union). After this
> incident occurred, two separate transactions were caught on video at
> the Red Box, located at the Circle K, 2702 Wrightsboro Road, where
> the card was used for a purchase of $3.24 on January 10, 2019, and
> the Red Box, located at Walgreens, 3228 Wrightsboro Road, where
> the card was used for a purchase of $3.78 on January 10, 2019. These
> transactions were caught on video tape by the respective businesses
> and **the person making these transactions was identified as George
> Angel Harris.**

(R. 38-7 at 2) (emphasis added). There were no facts stated in support of the

conclusory statement that the suspect was "identified" as Harris.

The affidavit was completely silent about how Harris was identified and by

whom.   And nothing was said about any investigation that was conducted to

confirm the alleged identification, including but not limited to interviews of the

suspect or others able to identify him or verify his whereabouts, measurements of

the crime scene relative to the height of the suspect, or comparison of physical characteristics between the suspect depicted in the video and known or readily available photographs of Harris during the relevant time frame. Nor was anything said about the complete absence of such an investigation, which would have let the magistrate know that the entire case rested on a shaky photo identification that was not corroborated by routine investigative methods. Finally, the photographs themselves were not submitted, which would have allowed the magistrate to make her own assessment. (R. 30-1 at 52, 55-56). The only "fact" listed to support probable cause was Hixon's conclusory statement that Harris had been "identified" as the offender, without saying how or by whom.

These material omissions authorize a jury to find that the affidavit failed to provide the magistrate with the requisite "particular facts and circumstances underlying the existence of probable cause." *Franks v. Delaware,* 438 U.S. at 165. While "negligent or innocent mistakes do not violate the Fourth Amendment," *Madiwale v. Savaiko*, 117 F. 3d 1321, 1326 (11th Cir. 1997), "a law enforcement officer recklessly disregards the truth when he **should have recognized the error** in the warrant application, or at least **harbored serious doubts** as to the facts contained therein. This is especially true when the inconsistency gives the agent **cause to investigate further**." *Daniels v. Bango*, 487 F. App'x 532, 537 (11th Cir. 2012) (citing *United States v. Kirk*, 781 F. 2d 1498, 1503 (11th Cir. 1986))

(emphasis added).  Under these clearly established guiding principles, a reasonable officer "should have recognized the error," should have "at least harbored serious doubts," and should have recognized that there was "cause to investigate further" the complete absence of facts to support the alleged identification.

### B. Investigators Bultman and Hixon Violated Clearly Established Fourth Amendment Law by Failing to Conduct a Reasonable Investigation Before Causing an Arrest to be Made Without Probable Cause

This Court has made clear that there is a duty to conduct a reasonable investigation under the Fourth Amendment.  *Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018) (denying summary judgment on false arrest claim against one investigator but affirming it as to other officers).

> Of course, "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," but **the officer may not turn a blind eye to evidence suggesting that a suspect is innocent** by "choos[ing] to ignore information that has been offered to him or her" or **by "elect[ing] not to obtain easily discoverable facts**."

*Id.* at 1297 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004).  Such "easily discoverable facts" could have been obtained by taking routine investigative steps such as interviewing Harris, determining his whereabouts at the time of the crime, and looking for contemporaneous photographs online or elsewhere before falsely representing that he had been positively identified.  While some might argue that the minor nature of this crime –

using a stolen debit card to rent $7.02 worth of movies from a Redbox machine – is not worth the time and resources that would be required to conduct a proper investigation, the two violations that Harris was charged with could have sent him to prison for up to 4 years.  O.C.G.A. §16-9-38(a).  That is why the Fourth Amendment is so important, and why it is so important for law enforcement to get the facts right.

*Cozzi* imposes a duty to investigate "easily discoverable facts."  892 F.3d at 1297.  But the trial court mischaracterizes that duty, stating in essence that there is no duty to investigate unless the officer has actual knowledge of exculpatory facts and chooses to ignore them.  That is not only a distortion of this Court's holding, but it flies in the face of the Fourth Amendment's objective reasonableness standard by implicitly turning it into a subjective one under which all mistakes are reasonable so long as the officer subjectively believes them to be true.  That is not the standard, and if it were, law enforcement officers would have no incentive to ever conduct investigations at all if they believed they had the right guy.  Because there is no way to read an officer's mind, he or she could justify all manner of unreasonable seizures simply by claiming they believed the suspect was guilty, which would make the Fourth Amendment a dead letter.  *See also Rankin v. Evans*, 133 F. 3d 1425 (1998) ("arresting officer is required to conduct a reasonable investigation to establish probable cause").

26

The investigation that was inadequate to establish probable cause in *Cozzi* – which was based on tips from two informants who identified Cozzi as the suspect in a crime scene video that aired on television – was much more comprehensive than the alleged investigation in this case, where only one person made a shaky identification and failed to conduct any additional investigation at all.    The investigator in *Cozzi* even obtained a search warrant to look for evidence in the suspect's home before having him arrested:

> While the officers continued their investigation, a surveillance video of the attempted robbery was shown on Crime Stoppers, a television program designed to elicit tips and information from the public about unsolved crimes in the local area. After the video aired, Crime Stoppers received an anonymous tip that Cozzi "resemble[d] the subject featured for the bomb threat." ... According to the tipster, Cozzi had a tattoo that said "Lori" on his right hand and lived in Center Point, Alabama. *Id.*

> Meanwhile, a law enforcement officer with the Jefferson County Sheriff's Office received a similar tip from a confidential informant and sent it to Thomas. The informant stated that he recognized the person in the Crime Stoppers video as Cozzi based on a unique walking style; the hat and shoes the perpetrator wore; and the mask, which the informant said was similar to the kind Cozzi used for painting cars. The informant also provided Cozzi's address and said that Cozzi had a severe Lortab addiction and drove a purple pickup truck. After another officer drove by the given address and saw a purple truck parked outside, Thomas applied for and received a search warrant for Cozzi's home. When Thomas obtained the search warrant, the only evidence linking Cozzi to the crimes were the two tips, one anonymous and one from an informant unknown to Thomas, that Cozzi resembled the perpetrator in the crime scene surveillance video shown on television.

892 S.E. 3d at 1292.  The search of the home and subsequent investigation led to additional evidence, some of it consistent and some of it inconsistent with the identification of Cozzi as the suspect – much like the evidence in this case would have been had it been vetted by a true investigation.  Like Mr. Harris, Cozzi was arrested based on his resemblance to the suspect in the video, but unlike Harris, "Cozzi was questioned and released the next day after Investigator Thomas was unable to 'find something that could substantiate a warrant for his arrest.'"  *Id.* at 1293.  Unlike Cozzi, Harris had to wait in jail until his parents could post his bail, and he had to hire a lawyer to go to court and fight to get the charges against him dismissed.  Because this Court allowed Cozzi's case to go forward against Investigator Thomas based on a similarly questionable video identification – even with a significant follow-up investigation prior to the arrest – the instant case should also be allowed to go forward against Investigators Bultman and Hixon.

While the defective affidavit in this case was sworn to by Hixon, he relied solely upon information provided by Bultman, so jurors can find them both liable from a causation standpoint.  Just as a private actor causes who causes the police to falsely arrest or prosecuted someone can be held be liable for false imprisonment, the same can be said for a police officer who knowingly provides information that causes someone to be arrested without probable cause by another officer.  *Compare Adams v. Carlisle*, 278 Ga. App. 777, 630 S.E. 2d 539, *cert. denied*

(2006) (full court) (officers reasonably believed there was probable cause to arrest and prosecute plaintiff for passing counterfeit money based on information provided by merchant, but there remained a jury question as to liability of cashier who performed test on bill); *Corporate Property Investors v. Milon*, 249 Ga. App. 699, 549 S.E.2d 157, *cert. denied* (2001) (police officer with good faith belief that facts provided by store employee gave officer probable cause to make shoplifting arrest was entitled to summary judgment, but jury question remained as to whether store was liable for urging arrest when there was no factual basis for doing so).[4]

The same principles of causation apply under both federal and state law, because it is axiomatic that "§1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Malley v. Briggs,* 475 U.S. 335, 344–45, n. 7 (1986) (citing *Monroe v. Pape,* 365 U.S. 167, 187 (1961)); *see also Carey v. Piphus,* 435 U.S. 247, 255–59 (1978). "A jury may take into account unreasonable police conduct prior to the [Fourth Amendment violation] that foreseeably created" it. *Hooks v. Brewer*, No. 3:16-cv-00023-DHB-BKE at *57-*58 (S.D. Ga. 1/29/2018), *aff'd in part and rev'd in part on other grounds*, No. 18-10628 (11th Cir. 6/19/2020), *cert. denied sub nom. Brewer v. Hooks*, No. 20-835 (U.S. 2/22/2021) (officer who performed

---

[4] While Appellant has cited Georgia law because of the overlap between federal and state common law tort principles, he has decided for the sake of simplicity to drop his state law claims for purposes of this appeal.

unconstitutional search could be held liable for shooting of citizen by another officer during the course of the search, which "should be subjected to scrutiny under the bright and revealing light of a jury trial," *id.* at \*71). Since it was the failure of both Defendants to conduct a reasonable investigation that proximately caused Mr. Harris to be deprived of his Fourth Amendment rights, both Defendants can be viewed as joint tortfeasors.

## C. Because Both Defendants Violated Clearly Established Law, They Are Not Entitled to Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from individual claims if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Porter v. Massarelli*, 303 Ga. App. 91, 93, 692 S.E.2d 722, 724 (2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002). To overcome the defense of qualified immunity, a plaintiff must show that the Defendant had 'fair warning' of what the law required. 536 U.S. at 741. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). All that is required is that "in the light of pre-existing law, the unlawfulness must be apparent." *Id.*

"It is clearly established that an arrest without probable cause violates the

Fourth Amendment." *Von Stein v. Bresher*, 904 F.2d 572, 578 (11th Cir. 1990).

That is an obvious constitutional principle embedded in the language of the Fourth

Amendment. False arrest cases are thus routinely considered cases of "obvious

clarity" or as cases governed by "broad principles" announced in prior decisional

law. *See Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002); *Thornton v. City of

Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998); *Sheth v. Webster*, 145 F.3d 1231,

1238 (l1th Cir. 1998); *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir.

2004); *Davis v. Williams*, 451 F.3d 759 (l1th Cir. 2006).

Because a reasonable officer in the position of Bultman or Hixon would not

have believed that there were sufficient facts to establish probable cause against

Harris under clearly established Fourth Amendment law, the trial court erred by

granting summary judgment on the issue of qualified immunity.

> In a false arrest case such as this one, qualified immunity protects the
> police from such suits, but only up to the line defined by the arguable
> probable cause standard:  whether "reasonable  officers  in the same
> circumstances  and possessing the same knowledge as the Defendant[]
> could have believed that probable cause existed to arrest." **Where, as
> here, the resolution of disputed critical facts determines on which
> side of this line the officer's conduct fell, summary judgment is
> inappropriate.**

*Skop v. City of Atlanta*, 485 F.3d 1130, 1144 (11th Cir. 2007) (quoting *Lee v.

Ferraro*, 284 F. 3d 1188, 1195 (11th Cir. 2002) (emphasis added).

An officer cannot manufacture probable cause where there is none by

making false or misleading statements to obtain a warrant. *Franks v. Delaware*, 438 U.S. 154 (1978). A statement that omits material facts – like the factual basis, if any, for a conclusory statement that the subject of the warrant has been positively identified without explaining how or by whom – is misleading when the investigation is unreliable and uncorroborated. It is also clearly established law that police officers may not rely upon false statements made by others in support of a warrant application. *See Malley v. Briggs*, 475 U.S. 335 (1986) (no qualified immunity where a reasonable officer would have known that the facts stated in the affidavit do not constitute probable cause). These are clearly established rules that apply with obviously clarity independently of the particularized facts of the cases from which they arise.

If that were not enough, the law is also clear that an officer who swears out an application for an arrest warrant must provide the magistrate with the "particular facts and circumstances underlying the existence of probable cause" – not just conclusory statements unsupported by facts. *Franks,* 438 U.S. at 165. Sufficient facts must be given to enable the magistrate to form his or her own conclusion about the existence of probable cause. *Id.*; *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 565 (1971). And where the circumstances are such that the officer "should have recognized the error in the warrant application, or at least harbored serious doubts as to the facts contained

therein," he or she has a duty to investigate further." *Daniels v. Bango*, 487 F. App'x 532, 537 (11th Cir. 2012) (citing *United States v. Kirk*, 781 F. 2d 1498, 1503 (11th Cir. 1986)).

It was against this backdrop of clearly established law that the Court denied qualified immunity to the investigator in *Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018):

> Because Cozzi was arrested without arguable probable cause, "[t]he second qualified immunity inquiry is, in the context of this case, straightforward: our binding precedent clearly established, at the time of [Cozzi's] arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures." *Skop v. City of Atlanta*, 485 F.3d 1130, 1143-44 (11th Cir. 2007). **In arresting Cozzi without arguable probable cause, Thomas violated clearly established law and thus is not entitled to qualified immunity.**

892 F.3d at 1297-98 (emphasis added); *see also Rankin v. Evans*, 133 F. 3d 1425 (1998) ("arresting officer is required to conduct a reasonable investigation to establish probable cause"). The same should hold true in this case.

### D. Plaintiff's Law Enforcement Expert Should be Permitted to Testify that the Investigation Was Unreasonable

Plaintiffs have enlisted Timothy Williams, Jr., a prominent law enforcement expert with decades of experience as a police officer, investigator, trainer, and law enforcement executive who is retired from the Los Angeles Police Department. Mr. Williams has testified in dozens of civil cases around the country as an expert

on police procedures and proper investigative techniques.  (R. 38-9).

In filing his motion to exclude Williams' testimony, Defendant Bultman did not contend that Williams is unqualified or that he lacks special expertise – a fact which is acknowledged by the trial court[5] – but rather, that "Williams' specialized knowledge will not help the trier of fact to understand the evidence or to determine a fact at issue."  (R. 21 at 4).    Bultman also contended that Williams' testimony "fails the rest of the *Daubert* test," calling his opinions "*ipse dixit* on steroids" while mischaracterizing the basis for those opinions.  (R. 21 at 6).  This brief will focus on the true basis for Williams' opinions – not just the ones that opposing counsel has isolated out of context – and will explain why other district courts throughout the nation have consistently allowed his testimony.

## 1.  The *Daubert* Standard

An expert's testimony may be based upon his "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Under Rule 702, expert testimony is admissible if it aids the finder of fact.  Furthermore, district courts must take a liberal view on the qualifications of an expert witness under Rule 702.  *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006).

*Daubert* added two additional requirements to the Rule:  that the expert's

---

[5] "There appears to be no dispute Mr. Williams is qualified to testify as an expert." (R. 50 at 11).

testimony be reliable, and that it be relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also McDowell v. Brown*, 392 F. 3d 1283, 1298 (11th Cir. 2004). To determine the reliability of a scientific expert under *Daubert*, a district court may consider the following four non-exhaustive factors: "(1) Testability of the theory or technique; (2) whether or not there is a known or potential rate of error; (3) whether the theory or technique has been subjected to peer review; and (4) whether the theory has received general acceptance in the relevant community." *Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1271 (N.D. Ga. 2009) (citing *Daubert*, 509 U.S. at 593-94). Expert testimony is considered relevant when "it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F. 3d 1300, 1312 (11th Cir. 1999).

While *Daubert* originally applied only to scientific testimony, its reach was extended to nonscientific experts in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). In *Kumho*, the Court stressed that the factors identified in *Daubert* "do *not* constitute a definitive checklist or test." *Id.* at 150.

> While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's "gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (internal quotation marks omitted). Furthermore, *Kumho* emphasized that the goal of gatekeeping is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

*Adams v. Lab. Corp. of Am*., 760 F.3d 1322, 1327 (11th Cir. 2014).  In the field of law enforcement, an expert such as Williams is relying on practices and techniques that have been developed through training and experience but not necessarily reduced to written standards.  Just as a doctor can testify about the standard of care based upon what a reasonable doctor would do under the circumstances to prevent harm to a patient, a law enforcement expert can testify from his training and experience about what a reasonable investigator would do to avoid arresting the wrong person.

Under the current version of Rule 702, which has been amended in response to *Daubert* and *Kumho,*

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Adams,* 760 F.3d at 1327–28.  Applying these considerations to the subject matter of his testimony and his qualifications to give it, it is clear that Mr.  Williams opinions are based on standard investigative practices that he has utilized in the

field throughout his career.  Because the Fourth Amendment requires that arrests be based on probable cause, the standard of care for law enforcement is to take reasonable steps to ensure that no one is arrested without probable cause, and those reasonable steps are the same anywhere that is bound by the Fourth Amendment.

In the court below, Bultman argued that Williams failed to identify agency-specific standards that Defendants violated, when in fact no such standards are implicated in this case.  In some cases in which he testifies, as indicated by his resume, local policies and procedures are relevant to determining the reasonableness of officer behavior, but those are not involved here.  Since it is the standard everywhere that arrests must be based on probable cause, it is also the standard everywhere that officers must conduct an investigation to establish probable cause before jumping to conclusions and making an arrest.

The broad phrase "law enforcement standards" is simply shorthand for the generally accepted manner in which reasonable police officers should conduct themselves to avoid making bad arrests and make sure that they get the right guy. It is uniformly recognized that you do not make an arrest until you have conducted the investigation, and in this case no investigation was conducted once Bultman looked at a video and thought the face was familiar.  That should have started an investigation, not ended it, and based on his decades of experience it is Williams' opinion that neither Bultman nor Hixon took appropriate steps to determine

whether Harris was the suspect they were looking for.  (R. 34-1 at 6-7).

### 2. Williams' knowledge is beyond the ken of lay jurors and his opinions go to ultimate issues of fact rather than ultimate issues of law.

Contrary to Bultman's assertion in his *Daubert* motion, Mr. Williams is not stating an "impermissible legal conclusion as the plaintiff's innocence" or to the ultimate issue of whether he was arrested without probable cause in violation of the Fourth Amendment.  While it is a violation of Rule 704 to allow an expert to opine on the reasonableness of the arrest because that is the ultimate *legal* issue to be decided by the jury, Rule 704 does allow an expert to give his opinion on an ultimate issue *of fact*.  Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.") While both ultimate issues turn on "reasonableness" in this case, the ultimate factual issue is whether the investigation leading to the arrest was reasonable, which will aid the jury in determining whether the arrest itself was reasonable without having the expert invade the province of the jury to decide the ultimate issue.

Yet the trial court seems to imply that an expert's testimony is not helpful *unless* it goes to the ultimate legal issue.

> At issue is whether the investigators violated Plaintiff's constitutional rights and Plaintiff provides Mr. Williams' testimony to show everything the investigators did was, in his opinion, below investigative standards.

(R. 50 at 13).  The fact that Williams is providing testimony about standard

investigative practices goes to the very heart of the reasonableness inquiry under the Fourth Amendment. This is no different than a doctor testifying about what is required by the standard of care for medical providers: there is no how-to manual that draws a line between reasonable and unreasonable conduct, which is why the opinions of experts are necessary in the first place to apply their training and experience to a given fact pattern.

If Williams were in fact engaging in "*ipse dixit* on steroids," it is likely that another court would have caught it by now. But despite the fact that Williams has provided a 13-page list containing the captions, case numbers, and dates where he has testified *219 times* around the country as of April 2021, Bultman's *Daubert* motion did not cite a single case in which Williams' testimony has been excluded, which may explain why Defendant Hixon did not bother to file his own *Daubert* motion. (R. 38-9 at 8-20).[6]

---

[6] The fact that the trial court's decision is such an extreme outlier would tend to support a finding of abuse of discretion on the *Daubert* ruling. On the other hand, the trial court's conclusion that jurors can decide the reasonableness issue without the benefit of expert testimony should mean that summary judgment is improper even if that testimony is excluded. If that were not the case, and if this Court were to rule that expert testimony was necessary while simultaneously excluding that of Williams, it would effectively turn the standard of review on summary judgment into an abuse of discretion standard, which would be a perversion of both *Daubert* and Rule 56. While abuse of discretion is a tough standard to meet, this Court has had occasion to creatively fold abuse of discretion language into de novo review when necessity demands a just outcome: "We decide pure law issues de novo, which is another way of saying that a ruling based on an error of law is an abuse of

Through his own research, Plaintiff's counsel has been able to access to 30 federal cases on PACER in which Williams has testified, and based on counsel's review, it appears that motions were filed to exclude or limit his testimony in just 4 of those cases. In none of those 4 cases was his testimony excluded altogether, but it was limited to certain subject matter in 2 cases. In one case, he was not permitted to offered opinions of a medical nature regarding positional asphyxia; 7otherwise, both the court and opposing counsel acknowledged that he could offer expert testimony about general law enforcement practices. *Johnson v. City of Los Angeles*, No. 2:17-CV-04104-KS, Doc. 104 (C.D. Cal. 1/31/2019). In the other case in which his testimony was limited, he was not permitted to testify as to ultimate issues and legal conclusions, but the court held that otherwise, "the subject matter of Mr. Williams' opinions … is generally appropriate for testimony." *Gonzales v. City of San Jose*, No. 4:13-CV-00695-PJH, Doc. 220 at 7 (N.D. Cal. 12/4/2015). That is 2 known cases out of 219 in which Williams'

---

discretion." *Young v. New Process Steel, LP*, 419 F.3d 1201, 1203 (11th Cir. 2005); *see also Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, 795 F.3d 1324, 1326 (11th Cir. 2015).

[7] It is unlikely that Williams intended to offer such testimony, but it is a favorite tactic of defense counsel to ask plaintiff's experts questions in their depositions that are outside their field of expertise so they will have an excuse to file a *Daubert* motion. The undersigned counsel has long believed that *Daubert* is a solution in search of a problem, and that weaknesses in an opposing expert's position are best addressed by challenging them in front of a jury without consuming the court's time, especially where it is undisputed that an expert is qualified.

testimony is known to have been limited but not excluded altogether.

In the other 2 cases located by counsel where *Daubert* motions were filed against Williams, the motions were denied outright. *Holmes v. County of Orange*, No. 8:16-cv-00867-JLS-JCG, Doc. 247 (C.D. Cal. 10/13/2017); *Tobias v. City of Los Angeles*, No. 2:17-cv-01076-DSF-AS, Doc. 248 (C.D. Cal. 12/7/2018). Counsel found several cases where defendants moved to exclude the testimony of other law enforcement experts but filed no such motions against Williams, conceding that he was well qualified and should be allowed to testify. In one such case, defense counsel argued that a second expert should be excluded as needlessly cumulative because the plaintiff already had the expert testimony of Williams, who "is clearly qualified to offer such opinions based on his lengthy career in law enforcement." *Patel v. County of Riverside*, No. 5:17-CV-1925-MWF (SPX), Doc. 55 at 2 (11/25/2019).

In all these cases, Williams was permitted to testify about general law enforcement practices. But the statistic that speaks loudest is the large number of cases in which Williams' testimony was not challenged at all – just as Plaintiff has not challenged the testimony of Defendant's expert who has used the same methodology – that is, reviewing the conduct of officers and evaluating it in the context of his own understanding of proper police practices – in reaching his own opinions. (R. 34-4). Since the conduct of police investigations is not within the

experience of ordinary laypersons, even if they do watch TV shows like *Law and Order* or *CSI*, expert testimony about the way investigations are normally conducted would certainly assist the jury in its deliberations. If Defendants did not believe that, they would not have retained their own expert – who, incidentally, Plaintiff has not objected to, although Plaintiff will certainly file a motion in limine in the trial court to exclude his testimony if this Court affirms the exclusion of Plaintiff's expert.

Opposing counsel's brief acknowledges that "a witness may testify as to the specific investigative procedures or the respective law enforcement agencies and what Investigators Bultman or Hixon did in their investigation" (R. 21 at 4), but the only witnesses capable of providing such testimony are police officers like the Defendants and their co-workers. Since Plaintiff does not have police officers on staff who have his back, the only way he can level the playing field is by hiring an independent expert who can testify about the reasonableness of the investigation (or lack thereof) based on generally accepted practices of law enforcement that are "the same as you see them all across the country." (R. 21-1 at 47).

After reviewing the Defendants' conduct as someone who has more law enforcement experience than both Defendants combined, Williams has a sufficient basis to concluded that a proper investigation was not done, irrespective of whatever departmental procedures were or were not followed. In his own words,

…investigations are the same all across the country, approaches are the same all across the country, science is the same all across the country, resources are the same all across the county, and you've got to exercise and use those things that are put in your toolbox to get the answers you're looking for to come to a successful conclusion.

(R. 26-1 at 38:8-15). That is exactly what both he and the defense expert have done in this case. If Plaintiff's expert is not allowed to form "an opinion or inference … because it embraces an ultimate issue" then it goes without saying that Defendants and their witnesses – expert or otherwise – should not be allowed to give such testimony either. Fed. R. Evid. 704.

### 3. Williams' specific criticisms of Defendants are based on decades of law enforcement experience and accumulated knowledge of generally accepted investigative practices, the application of which is a sound methodology in the context of this case.

Williams essentially concludes that the conduct of the investigators in this case was tantamount to no investigation at all, and Bultman objects to the generality of that opinion. But when Williams does offer a specific criticism going beyond that general statement, opposing counsel argues that he is either not qualified to express such criticisms or that his opinion adds nothing to the juror's own perceptions. While laypersons are indeed able to compare differences between photos of Harris and the images on the security video, Williams' expertise provides guidance in evaluating the significance of those differences.

For example, his reference to studies on cross-ethnic identification do not

require that he be an expert on that subject, but the fact that he recognizes the literature as authoritative adds weight his opinion that a proper investigation should have been conducted to rule out the possibility of error in such an identification. In his report, Williams expresses that opinion as follows:

> In my analysis of the April 26, 2021 deposition of Investigator Hixon, the Plaintiff was identified as the suspect in this matter by a consensus of his colleagues absent any investigation to connect the Plaintiff to the crime. This type of investigation is very problematic in that it brings up the critical issue of cross ethnic identification. The consensus of this identification, which was made by security photographs to a photograph(s) of the Plaintiff were made by all White individuals in an identification of a Black suspect. This type of investigation falls below law enforcement standards and could lead to a wrongful conviction.

(R. 38-9 at 6, ¶3). In the absence of such expert testimony based on his familiarity with this "critical issue" and its implications for law enforcement, jurors would be left to their own devices to argue about how well black, white, or brown people are able to recognize each other across racial lines as well as they are able to recognize members of their own race. Williams' testimony that the law enforcement community recognizes that phenomenon – which in this case accentuates the need for a more thorough investigation – will reduce the need for that distraction.

In addition to the problem of cross-ethnic identification, Williams' report also offers the following criticisms of Defendants' conduct in support of his overall conclusion that they failed to conduct a reasonable investigation:

1.    In my analysis of the discovery, I received in this matter, Investigator Bultman allegedly connected the theft of the debit card in question to Mr. Harris allegedly entering an unlocked 2016 Toyota Tundra, between the dates of January 9, 2019 and January 11, 2019. In my analysis, there was no investigation conducted by Investigator Bultman to forensically connect Mr. Harris to the vehicle and the theft of the debit card. A through and concise investigation was not completed to connect Mr. Harris to the entering of the victim's vehicle and the taking of his debit card.

2.    In my analysis of the discovery, both Investigators Bultman and Hixon comparing photographs of Mr. Harris to a security video(s) of a male Black is very problematic. There was no investigation conducted by Investigator Hixon to establish the whereabouts of Mr. Harris during the theft of the debit card or the whereabouts of Mr. Harris at the times of the debit card usage at the two Red Box locations. In the photographs l reviewed. Mr. Harris is not the suspect depicted in the security photographs. Investigators Bultman and Hixon investigative approach fell/falls below law enforcement investigative standards.

4.    In my further analysis of Investigator Hixon April 26, 2021 deposition, at the time of this investigation Investigator Hixon had not taken any classes on photograph identification. Photographic investigation approaches are critical to all criminal investigations. Without the requisite training, law enforcement personnel should not be assigned to an investigative assignment of any magnitude. Without this required training, the Richmond County Sheriff's Department has placed itself in a risk management position by placing Investigator Hixon in an investigative assignment/position without the requisite training.[8] It is my opinion, based upon my background, education and experience as well as being positioned as a Senior Detective Supervisor at the highest levels of criminal and administrative investigations, Investigator Hixon was not trained to be in the position he was then working and presently working.

---

[8] While Harris has asserted no claim against the sheriff or county for failure to train, Williams' opinion emphasizes the point that a proper investigation was not conducted, and one reason that may have occurred is due to lack of training.

5.     In additional analysis of Investigator Hixon's deposition, he conducted an extremely poor investigation in this matter. There was no crime scene investigation to obtain the measurements of the Red Box to assist in the identification of the correct suspect. This portion of the investigation fell/falls below law enforcement investigative standards.

6.     Further analys.is of Investigator Hixon's deposition, there was no investigation to ascertain if the Plaintiff's hair matched the hair of the suspect. In my analysis, the hair did not match. The Plaintiff had "locs"[9] that were past his shoulders. The suspect hair style was short, possible "locs." Again, this portion of the investigation fell/falls below law enforcement investigative standards.

7.     My further analysis of Investigator Hixon's deposition revealed that he did not try to contact the Plaintiff to ascertain if he was involved in this matter. Investigator Hixon relied on what Investigator Bultman did, and Investigator Bultman, in my opinion, did nothing as it relates to a coherent criminal investigation in this matter. Failure to contact and interview the Plaintiff in this matter, fell/falls below law enforcement investigative standards.

8.     The Affidavits for the February 20, 2019 warrants are not accurate. The Affidavit for the Red Box located 2702 Wrightsboro, Road, the Circle K, stated the incident of the debit card usage was on Jan 10, 2019 at approximately 12:00 AM. The investigative report stated the incident occurred on January 13, 2019 at 3:33 PM. Debit card transaction documents [stated the date as] January 10, 2019 at 7:29 AM. Seasoned investigative personnel are trained that arrest warrant information must be accurate. Further, warrants are issued under penalty of perjury. There are three different times for the Circle K event. A thorough and concise investigation was not completed in this case and fell/falls below law enforcement investigative standards.

---

[9] Another term for "dreadlocks." https://en.wikipedia.org/wiki/Dreadlocks   The suspect in the security video had much shorter hair than Mr. Harris during that time frame. (Compare R. 38-2 and 38-4).  Had the investigators made contact with him, it would have been clear that he was not the suspect in the video.

(R. 38-9 at 6-7) (with minor changes to punctuation, capitalization, and spelling to correct typos and format conversion glitches).

Review of Defendants' expert report shows that he followed similar methodology in how he reviewed the case and applied his knowledge to the facts. Even though Plaintiff does not agree with his conclusions, Plaintiff acknowledges that Defendants' expert is entitled to express his opinion. While Defendants' expert was not deposed in this case, Plaintiff's counsel has deposed him before and has no doubt that he would support his opinions about the reasonableness of the investigation no differently than Williams has. The one overarching standard that applies to law enforcement across America is that all arrests must be based on probable cause, and all leads or hunches must be investigated to determine whether the evidence adds up to probable cause. Indeed, Defendant's expert repeatedly uses the phrases "*all* officers are trained" this and "officers *throughout the United States*" that, which are simply other ways of saying what Williams calls professional law enforcement standards. (R. 34-4 at 22-23, 27) (emphasis added). In other places, he uses virtually the same terminology as Williams when he refers to "generally accepted practices in law enforcement" and "law enforcement practices nationwide." (*Id.* at 21-22, 27-28). These are the very same standards that opposing counsel faults Williams for not being more specific about. In a

nutshell, the conclusion of Defendant's expert that a reasonable investigation was conducted is no more inadmissible than Williams' conclusion that it was not, and opposing counsel's word games with Williams' deposition do not change that fact. Either both sides are entitled to their expert or neither side should be.

### 4. Williams' testimony does not violate Rule 403.

There is nothing in Mr. Williams's report or testimony that it so inflammatory that its prejudicial impact outweighs its probative value. The fact that his testimony strengthens Plaintiff's case is not unduly prejudicial; in fact, that is the very purpose of an expert. However, this is not a proper subject for a *Daubert* motion. If a Rule 403 issue should arise with respect to a specific area of testimony, it should be decided on a motion in limine to exclude that particular testimony – not on a motion to exclude an expert's testimony in its entirety.

## <u>CONCLUSION</u>

For the reasons set forth in the foregoing argument of law and citation of authority, Plaintiff/Appellant George Harris requests that the judgment of the trial court be reversed and the case be remanded for a jury trial.

Respectfully submitted this 24th day of August, 2022.

*/s/Craig T. Jones*
CRAIG T. JONES
Attorney for Appellant
Georgia Bar No. 399476

CRAIG T. JONES, P.C.
Post Office 129
Washington, Georgia 30673
(706) 678-2364 (office)
(678) 643-0062 (cell)
craigthomasjones@outlook.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Appellants complies with the 13,000-word type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by 11th Cir. Rule 32-4.  This Brief contains approximately 10,067 words, including footnotes, according to Microsoft Word's word-count function, and was prepared using Times New Roman 14-point typeface.

*/s/ Craig T. Jones*

_____
Craig T. Jones
Ga. Bar No. 399476
Attorney for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 24th day of August, 2022, I served the foregoing Brief of Appellant upon the following counsel via electronic filing and First Class U.S. Mail:

Randolph Frails, Esq.
Tameka Haynes, Esq.
Frails & Wilson
211 Pleasant Home Rd., Suite A-1
Augusta, GA  30907

James B. Ellington, Esq.
Hull Barrett, P.C.
P.O. Box 1564
Augusta, GA 30903

*/s/ Craig T. Jones*

_____
Craig T. Jones
Georgia Bar No. 399476
Counsel for Appellant

CRAIG T. JONES, P.C.
Post Office Box 129
Washington, Georgia 30673
(678) 643-0062
craigthomasjones@outlook.com